**ORIGINAL**

U.S. COURTS

01 JUL -6 AM 11: 22

REC'D_____FILED_____
CAMERON S. BURKE
CLERK          IDAHO

**RICHARD H. GREENER (ISB No. 1191)**
**THOMAS G. WALKER (ISB No. 1856)**
**LaDAWN MARSTERS (ISB No. 5663)**
**COSHO, HUMPHREY, GREENER & WELSH, P.A.**
Attorneys at Law
Carnegie Building
815 West Washington Street
Boise, Idaho 83702
Telephone:     (208)344-7811
Facsimile:     (208)338-3290

**LYNN LINCOLN SARKO, WSBA #16569**
**MARK A. GRIFFIN, WSBA #16296**
**ELIZABETH A. LELAND, WSBA #23433**
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
Telephone:     (206) 623-1900
Facsimile:     (206) 623-3384

Attorneys for Plaintiff Class

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MATTHEW J. DOUGLAS; GLEN DOUGLAS; and ROXANNE SARMENTO, on behalf of themselves and all others similarly situated,<br><br>               Plaintiffs,<br><br>v.<br><br>PRIMEBUYNETWORK.COM, INC., an Oklahoma corporation; CHARLES H. MICHEL; CHARLES CULVER; GARY E. BRYANT; and NEWPORT CAPITAL CONSULTANTS, INC., a California Corporation,<br><br>               Defendants. | **Case No. CIV 01-0207-N-EJL**<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL AND STATE SECURITIES LAWS AND THE IDAHO CONSUMER PROTECTION ACT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, by their undersigned attorneys, allege, upon information and belief, based upon, *inter alia*, the investigation conducted by and through their attorneys, except as to those allegations which pertain to plaintiffs which are alleged upon knowledge, as follows:

## NATURE OF THE ACTION

1. This is a class action brought by plaintiffs on behalf of themselves and all other persons or entities who purchased or otherwise acquired unregistered securities in the form of memberships and/or stock issued by PrimeBuyNetwork.com, Inc., also known and doing business as PrimeBuy Network.com, Inc. ("PrimeBuy" or the "Company"), from September 24, 1999 to the present, inclusive (the "Class Period"), except as noted below, and who were damaged thereby. Plaintiffs seek to recover damages caused to the Class by defendants' sale of unregistered securities, and by defendants' misrepresentations and omissions of material fact in connection with the operation, financial condition and prospects of PrimeBuy, and in connection with PrimeBuy securities.

2. This Class Action involves the sale of at least several million dollars in unregistered securities, through a fraudulent offering perpetrated against thousands of investors in the United States by PrimeBuy, a so-called Internet "shopping mall," and its founders, and affiliated persons and entities.

3. Since its inception on September 24, 1999, PrimeBuy has solicited investors, through its web site, road shows, and other mechanisms, to purchase memberships, which purportedly provide investors with three distinct ways to earn money: (1) as a member of "an initial community of 100,000 Individual E-Commerce" business owners and distributors; (2) through

payment of multilevel marketing commissions for the recruitment of new members; and (3) through investment opportunities in "founders" and other shares of stock in the Company.

4. Through its web site and other marketing mechanisms, PrimeBuy is conducting illegal offerings by selling unregistered PrimeBuy memberships and stock.

5. Specifically, PrimeBuy promises investors the opportunity to participate as "Independent Sales Representatives" in an "E-Mall Community," whereby investors purchase and customize web sites that provide online consumer shopping opportunities and other information to consumers. For each product purchased through the web site, the investor is to receive a commission.

6. Moreover, PrimeBuy offers more expensive memberships, whereby investors pay additional money to become "Managers." As Managers, investors are promised the opportunity to earn weekly commissions by recruiting new members.

7. In addition, defendants represented that investors who "upgrade" from Manager to Regional Manager membership status through the payment of additional money are entitled to an even greater share of commissions.

8. The supposed PrimeBuy commissions, however, were earned almost entirely by recruiting new participants to the program.

9. Thus, throughout the Class Period, defendants offered investments in PrimeBuy by representing to potential investors that this company was a rapidly growing Internet marketing opportunity.

10. In fact, defendants were conducting a classic "pyramid" scheme. The so-called PrimeBuy Internet Mall was simply a multilevel marketing scheme for which no meaningful

consideration was offered other than compensation for soliciting other members. The so-called shopping malls were of insignificant value, as they merely constituted an array of shopping "opportunities" already available on the Internet.

11. Defendants also offered and sold shares of unregistered PrimeBuy common stock. At times, to induce investors to purchase the illegal and unregistered stock, defendants misrepresented that the stock was registered in accordance with applicable state and federal securities laws.

12. As an inducement to potential investors, defendants misrepresented that the Company would be holding an initial public offering of its stock during September 2000. In order to get in on the ground floor, defendants told investors, they could purchase memberships and receive "gifted" shares of PrimeBuy common stock. In addition, members could purchase "founders" shares of PrimeBuy common stock for $1 per share which, defendants claimed, would be worth many times that amount when the Company went public in September of 2000.

13. In fact, the Company never went public and plaintiffs and members of the Class are left holding worthless shares of unregistered stock in an illegal pyramid scheme.

14. By reason of these activities, the defendants have violated multiple sections of the Securities Act of 1933 (the "Act"), the Securities Exchange Act of 1934 (the "Exchange Act"), and the Idaho Securities and Consumer Protection Acts.

## JURISDICTION AND VENUE

15. This court has jurisdiction over the subject matter of this action pursuant to Section 22(a) of the Act, as amended, 15 U.S.C. § 77(v)((a), § 27 of the Exchange Act, as amended, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

16. This is a securities fraud lawsuit arising under Section 5 of the Act, 15 U.S.C. § 77(e)(a)(2), Exchange Act Sections 10(b) and 20(a), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, and principles of common law.

17. Venue is proper in this District pursuant to Section 22(a) of the Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) and (c). Many of the acts complained of herein, including the issuance and dissemination of securities, occurred in this District. Defendants maintain places of business in this District.

18. In connection with the acts and conduct complained of, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

19. Plaintiff Matthew J. Douglas is a resident of Hayden Lake, Idaho. As described in his sworn Certification, previously filed in this litigation and incorporated by reference, plaintiff purchased PrimeBuy Network.com, Inc. securities and was damaged thereby.

20. Plaintiff Glen Douglas is a resident of Post Falls, Idaho. As described in his sworn Certification, previously filed in this litigation and incorporated by reference, plaintiff purchased unregistered PrimeBuy Network.com, Inc. securities and was damaged thereby.

21. Plaintiff Roxanne Sarmento is a resident of Grand Junction, Colorado. As described in her sworn Certification, attached hereto and incorporated by reference, plaintiff purchased unregistered PrimeBuy Network.com, Inc. securities and was damaged thereby.

22. Defendant PrimeBuy was incorporated on September 24, 1999, under the laws of the State of Oklahoma. Its principal executive offices are located at 4000 Barranca Parkway, Suite

220, Irvine, California, 92604. Founded by defendants Michel and Culver, PrimeBuy touts itself as "the world's leading direct online consumer shopping company." PrimeBuy does business worldwide, including in the United States and Australia. According to defendants' marketing materials, "[t]he Internet has NO borders and PrimeBuy provides services anywhere in the world."

23. Defendant Charles J. Michel ("Michael") is a co-founder of PrimeBuy and was, at all relevant times, its President.

24. Defendant Charles "Charlie" Culver ("Culver") is a co-founder of PrimeBuy and was, at all relevant times, its Secretary.

25. Throughout this Complaint, defendants Michael and Culver are referred to as the "Individual Defendants."

26. Defendant Gary E. Bryant ("Bryant") is the President of Newport Capital Consultants, Inc. and one of PrimeBuy's incorporators. According to Charlie [Culver], he "is part of [PrimeBuy] and has been since day one."

27. Defendant Newport Capital Consultants, Inc. ("Newport") is a California Corporation which claims PrimeBuy as one of its successful customers and actively promoted PrimeBuy as a suitable investment.

28. Newport is  prominently featured on PrimeBuy's web site, touting its success in providing "unsurpassed experience in assisting companies . . . in the following areas . . .

- Broker Relations
- Aftermarket Support
- Consulting to Management Going Public
- Trading

**First Amended Class Action Complaint for violation of Federal and State Securities Laws and The Idaho Consumer Protection Act – Page 6**

- General Corporate Consulting
- Investment Banking Services
- Mergers & Acquisitions
- Spin-offs
- Obtaining NYSE, AMEX or Nasdaq Listing
- Introductions To Investment Bankers And Broker Dealers
- Up to $30 Million

On PrimeBuy's web site, www.primebuytown.com and elsewhere, Newport touts PrimeBuy's success and desirability as an investment.

## CLASS ALLEGATIONS

29. Plaintiffs bring this action as a Class Action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent a Class consisting of all persons who purchased or otherwise acquired unregistered securities in the form of memberships and/or stock issued by PrimeBuy from September 24, 1999 to the present (the "Class" and the "Class Period" respectively). In addition, with respect to liability asserted under the Idaho Securities Act, Idaho Code Sections 30-1401 to –1458, and with respect to liability asserted under the Idaho Consumer Protection Act, Idaho Code Sections 48-601, et seq., plaintiffs bring this action on behalf of a subclass of persons residing in the State of Idaho who purchased or otherwise acquired unregistered securities in the form of memberships and/or stock issued by PrimeBuy during the Class Period (the "Subclass"). Excluded from the Class and Subclass are defendants and their affiliates, subsidiaries, and co-conspirators.

30. The members of the Class and Subclass are so numerous that joinder of all Class and Subclass members is impracticable. Plaintiffs believe that there are at least several thousand members in the proposed Class and Subclass dispersed throughout the State of Idaho and other

states as well. For example, PrimeBuy's web page, www.primebuynetwork.com, provides investor testimonials from locations including Roseville, Michigan, San Ramone, California, Panama City, Florida, and Coeur D'Alene, Idaho. It is estimated that Class and Subclass members have been defrauded of at least several million dollars, with individual losses ranging from approximately $295 to more than $4,500.

31. Plaintiffs' claims are typical of those of the members of the Class and Subclass since plaintiffs and all members of the Class and Subclass sustained damages arising out of defendants' wrongful conduct in violation of federal law, as stated in this Amended Complaint. Plaintiffs' claims are also typical of the claims of the members of the Class and Subclass, in that plaintiffs and the Class and Subclass members invested in unregistered securities in the form of memberships and/or stock issued by PrimeBuy and sustained injury as a result.

32. Plaintiffs will fairly and adequately protect the interests of the Class and Subclass and have retained counsel competent and experienced in class and securities litigation. Plaintiffs do not have interests that are antagonistic to or in conflict with those of the Class and Subclass members plaintiffs seek to represent as Class and Subclass Representatives.

33. A Class Action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, because the damages suffered by some individual members of the Class and Subclass may be relatively small, the expense and burden of individual litigation makes it impossible for the members of the Class and Subclass to pursue such individual litigation in order to vindicate their rights. Plaintiffs are not aware of any problem that would prevent the maintenance of this action as a Class Action.

34. The names and addresses of those who purchased unregistered securities in the form of memberships and/or stock issued by PrimeBuy during the Class Period are available. Notice techniques and a form of notice similar to those customarily used in Class Actions arising under the securities laws will provide adequate notice to members of the Class and Subclass.

35. Common questions of law and fact exist as to all members of the Class and Subclass and predominate over any questions solely affecting individual members of the Class and Subclass. Among the questions of law and fact common to the Class and Subclass are:

a) Whether the investments sold by defendants are securities under state and/or federal securities laws;

b) Whether the defendants sold unregistered securities in violation of state and/or federal securities and other laws;

c) Whether defendants made material misrepresentations of fact and failed to disclose material facts in connection with the sale of securities in violation of state and/or federal securities and other laws;

d) Whether the Individual Defendants are liable as "control persons" for the acts of PrimeBuy and its agents under state and/or federal securities and other laws;

e) Whether defendants acted in good faith with regard to sales of memberships and/or stock issued by PrimeBuy;

f) Whether the members of the Class and Subclass have sustained damages and, if so, the proper measure thereof.

## DEFENDANTS' FRAUDULENT SCHEME

36. During the Class Period, defendants sold unregistered securities in the form of memberships and shares of PrimeBuy common stock, which shares were also referred to as "founders stock" and evidenced by PrimeBuy stock certificates. In connection with the sale of these unregistered securities, defendants made material misrepresentations and omitted to disclose material facts in violation of the law.

37. Defendants, pursuant to a general solicitation (including but not limited to road shows and advertisement over the Internet), sold the PrimeBuy securities to investors or "members," including plaintiffs and the other members of the Class and Subclass. Potential members were led to believe a profit could be made through their investments in the form of commissions earned as PrimeBuy Independent Sales Representatives, Network Managers, and/or Regional Managers.

38. Although members were obliged to contribute their own efforts in finding prospects and arranging for the prospects' participation in sales conference calls, they were to rely primarily on defendants' selling scheme and the selling efforts of defendants and their agents and employees to recover returns from their investments. All investment decisions, management services, operations, receipt of additional membership fees, and payment of commissions was to be performed by, or at the direction of, the defendants. Members earned commissions by convincing other investors to become PrimeBuy members.

39. Purchasers of the PrimeBuy securities retained a passive investment role only. They relied on PrimeBuy to make all management decisions concerning their investment. Risk of loss to investors existed throughout the term of the investments.

40. Thus, these investments, which primarily offered the potential member the opportunity of earning commissions on the sale of contracts to others, were investment contracts and thus were securities within the meaning of applicable state and federal securities laws, involving an investment of money in a common enterprise with an expectation of profits to come solely from the efforts of others.

41. Moreover, throughout the Class Period, the defendants encouraged investors to purchase PrimeBuy memberships by offering to "gift" them shares of stock in exchange for their membership purchase. Defendants also offered and sold "founders" shares of PrimeBuy common stock, which, defendants claimed, would be worth several times what investors paid once the Company went public in September 2000.

42. Throughout the Class Period, Defendant Newport, through its President Bryant, actively participated in Defendants' fraudulent scheme by, among other things, promoting PrimeBuy and making materially false and misleading statements concerning a PrimeBuy IPO and other matters.

43. Throughout the Class Period, as described herein, Defendant Bryant actively participated in Defendants' fraudulent scheme by promoting PrimeBuy and touting the company as, among other things the "finest" and "best" company in America. Moreover, Defendant Bryant made numerous fraudulent, false, deceptive, and misleading promises about PrimeBuy going public and the value of PrimeBuy's unregistered stock.

## SUBSTANTIVE ALLEGATIONS

44. On or about September 24, 1999, PrimeBuy was incorporated in the State of Oklahoma to engage in the Internet services business. The Individual Defendants are

PrimeBuy's founders and officers. Bryant is one of PrimeBuy's incorporators and his signature appears on PrimeBuy's Certificate of Incorporation, filed with the Oklahoma Secretary of State on September 24, 1999.

45. Throughout the Class Period, beginning on or about PrimeBuy's incorporation date, defendants repeatedly misrepresented the nature of PrimeBuy, convincing investors that PrimeBuy was a booming Internet marketing company, which provided opportunities to members to earn large sales commissions by operation of individual web sites providing "on line access to 10,000 brand name products and mall tenants including JC Penny, K-Mart, OfficeMax, etc." Recently, defendants have claimed that the number of available products has increased to "50 to 60 million products."

46. On February 16, 2000, PrimeBuy announced the expansion of its operations into "New Global Headquarters." At www.primebuynetwork.com, one of at least two web sites controlled and operated by defendants, PrimeBuy featured photographs of its grand new office complex and the following announcement:

> PrimeBuy Network.com, Inc., Expands Operations into New Global Headquarters
>
> PrimeBuy Network.com the world's leading online consumer shopping company, today announced it has now moved to global corporate headquarters in Irvine, California. Massive early growth and continued market dominance required the acquisition of facilities to accommodate expanded resources to meet current and future business demands. In the high technology center, the new global headquarters will accommodate Customer Service, R&D and Executive Staff.

47. During the Class Period, according to www.primebuynetwork.com, PrimeBuy's objective was

> To capitalize on the timing and explosive growth of the Internet "on line shopping" (E-Commerce) by creating an initial community of 100,000 Individual E-Commerce owners and distributors in 24 months who have a vested interest to discount shop in their own Internet . . . grow this group to 250,000 owners (shoppers) in 36 months. With a recognized value of 200 dollars per shopper on an E-commerce mall, this would create a Wall Street value of 50 million dollars for PrimeBuy Network.com.

48. PrimeBuy, through its web sites and other promotional materials, touted its Internet mall marketing scheme, promising members benefits including, but not limited to the following:

- "A business opportunity where you get into profits immediately: where you can earn several thousand dollars in the next 2 to 3 weeks."

- "A powerful, fast-paying compensation plan empowering individuals to earn a large immediate income while at the same time laying the foundation for a debt free, secure retirement."

- "Timing: in the next 12 months, PrimeBuy Network.com will create millionaires. . . . If there were a perfect time within our lifetime for creating wealth, now is that time, PrimeBuy Network.com is the Vehicle! IMMEDIATE INCOME, RETIREMENT INCOME AND STOCK OWNERSHIP!"

49. Defendants assured investors that PrimeBuy membership provided a unique competitive advantage over other e-commerce investments. According to www.primebuynetwork.com,

> Fortunes are made by positioning a company in front of a major trend with a competitive advantage. PrimeBuyNetwork.com's competitive advantage is creating an E-Commerce mall community where investors own their

shopping mall and have a vested interest to buy from their own stores and
share this discount with over 2 million products with others.

50. The web page also summarized the purported business opportunity being offered by
defendants as follows:

Product: "World class" wholesale E-commerce shopping mall and highly
desirable "community" of 100,000 shoppers and members.

51. Defendants further represented that "PrimeBuy Network's program is based upon
retail sales to the ultimate consumer . . . .The compensation plan is based upon retail sales."

52. To lure investors into their networking web, defendants filled their web site with
grandiose figures on Internet retailing and comments from prominent news and other
personalities regarding the Internet boom, all of which, in reality, were completely unrelated to
PrimeBuy. For example, defendants, on www.primebuynetwork.com, attempted to lend
credibility to their own fraudulent scheme by aligning themselves with the following "Magazine
Cover Stories":

FORTUNE, Oct 1998
INTERNET OR BUST "Don't get left in the dust. The smartest Companies
are using the net to create a new way of doing business."

TIME, Nov. 1998
KISS YOUR MALL GOODBUY "Online shopping is faster, cheaper and
better."

BUSINESS WEEK, August, 1998
VOLATILITY IS HERE TO STAY, "But technology will spur robust
growth."

U.S. NEWS & WORLD REPORT, December, 1998
SHOPPING ON THE WEB, "The surging E-Commerce business gets a
boost from takeover of Netscape."

FAMILY PC, February, 1999
"LEAVE THE HASSLES AT THE MALL. . . .Shop online!"

FORTUNE, August, 1999
".COMfever, Now B-school grads have caught it."

53. Similarly, defendants attempted to align themselves with more prominent Internet businesses, with statements such as one entitled "Wall Street Reflects Value of Internet," which provided investors with the following statistics, none of which had anything to do with PrimeBuy:

> AOL's capitalized value now exceeds General Motors - $64 billion vs. $24 billion.

> Yahoo's capitalized value tops CBS's - $37.5 billion vs. $24.4 billion.

> Amazon.com's cap value stands at $22 billion bigger than Sears Roebuck & Co.

> Priceline.com by the end of their first day trading became larger than R.J.R Reynolds and Delta Airlines

> Ebay.com capitalized value is $25 billion, 10% bigger than Anheuser-Busch, 25% bigger than Gap.

54. In their marketing materials provided to plaintiffs and the other members of the Class and Subclass, defendants even went so far as to quote Bill Gates, who opined ". . . E-commerce isn't a rising tide, it's a tidal wave."

55. Defendants also encouraged investors with statistics on e-commerce growth such as the following:

> From USA Today, Nov. 27, 1998

> | e-Bay | 1036% increase |
> |---|---|
> | Inktomi | 657% increase |
> | Amazon.com | 598% increase |

| Yahoo. Com | 596% increase |
| Theglobe.com | 346% increase |
| AOL | 308% increase |

By featuring figures such as these, defendants intended to and did mislead investors with promises that PrimeBuy would also experience exponential growth.

56. Defendants failed to provide similar statistics for PrimeBuy or disclose that the figures provided bore absolutely no relationship whatsoever to the PrimeBuy securities defendants offered and sold to unsuspecting investors.

57. Instead, defendants attributed each member's success to the availability of shopper incentives and touted the features available through these internet malls, stating, for example:

> The key ingredient to developing this community of shoppers is by providing incentives to individual mall owners as others shop in their mall (friends, relatives and associates). These incentives include heavily discounted products (factory direct), override commissions paid monthly and state of the art, internet services. The commission over-rides are paid as others shop in their E-commerce . . . and when shopping occurs on the malls they sell to others. The other internet services they will receive include free e-mail, on line auctions daily, net phone services, free chat rooms, auto mall, real estate services and trading services, travel services, educational references, etc.

58. Moreover, defendants heralded the strengths of PrimeBuy and its management team, "led by Charles Michel and Charles Culver" as having "extensive collective experience (20 years) at building network marketing distribution systems."

59. Defendants organized and participated in nationwide (and international) road shows at which they touted the benefits of PrimeBuy and offered memberships for sale.

60. For example, defendants held a road show during August 2000 at Two Rivers Convention Center in Grand Junction Colorado. The show consisted of a video presentation

followed by several live speakers, including Michel. E-commerce was promoted as the wave of the future, and attendees were encouraged to purchase PrimeBuy memberships. Plaintiffs believe that approximately 300 people attended the presentation.

61. More recently, on June 20, 2001, defendants issued a "Major Corporate Announcement," including information on a "12 City Tour in July & August [2001]." The Announcement assured recipients that "fortunes will be made" and encouraged them not to "miss this historic event."

62. PrimeBuy promised "weekly commissions paid directly to you!" and provided testimonials from satisfied members, who claimed to have earned enormous commissions in a short amount of time. Testimonials included the following:

> "I made $16,000.00 in the first 8 weeks! This is the easiest, most lucrative program I've seen in my 15 plus years in this industry!"
>
> Gloria C., Roseville, MI
>
> "I thank my sponsor, I thank the founders of this program, but most of all I thank the Good Lord! In the last 9 weeks I have made over $24,500.00 with PrimeBuy!"
>
> Terry H., Panama City, FL
>
> "I'm pretty new to this industry. I've been in the corporate world for the last 16 years, but no more! In 9 weeks with PrimeBuy Network.com I have already made over $21,000.00!"
>
> Gretchen A., San Ramone, CA
>
> "Would you believe a retired Firefighter could make this much money? With PrimeBuy, I've already made $19,900 in my first 10 weeks!"
>
> Dale W., Coeur D-Alene, ID.

63. Defendants assured investors that they could earn commissions on different levels, depending upon the price of the membership purchased.

64. For example, an investor could become an "Independent Sales Representative," whereby he or she was supposedly entitled to a low-level commission, as determined by a complex formula.

65. For an investment of approximately $295, a person could become a "Manager" and thereby "earn" commissions at a greater level than those earned by Independent Sales Representatives.

66. The top level was a "Regional Manager" position, which could be purchased by a Manager for an additional $495, bringing the total investment to $790.

67. Plaintiff Matthew Douglas paid $790 to defendants to become a PrimeBuy Regional Manager and to receive 200 so-called "gifted" shares of PrimeBuy common stock. He then purchased an additional 1000 shares of PrimeBuy common stock. These investments are set forth in greater detail in Matthew Douglas' shareholder certification, a copy of which is attached hereto.

68. Plaintiff Glen Douglas invested $790 to become a PrimeBuy Regional Manager and to receive 200 so-called "gifted" shares of PrimeBuy common stock. He then purchased an additional 4000 shares of PrimeBuy common stock. These investments are set forth in greater detail in Glen Douglas' shareholder certification, a copy of which is attached hereto.

69. Plaintiff Roxanne Sarmento paid $800 to defendants to become a PrimeBuy Regional Manager and "founding member." This investment is set forth in greater detail in Ms. Sarmento's shareholder certification, a copy of which is attached hereto.

70. In reality, however, these so-called commissions were earned almost entirely by recruiting new participants to the program.

71. In fact, in their marketing materials, defendants referred to retail commissions as "bonus volume."

72. And when asked "what do I do to make money *now* with PrimeBuy Network.com," defendants, in their marketing materials, responded:

> Simply invite guests to our extensive *Live Conference Call Presentation*, available 7 days per week. These presentations are done by the leaders of the company and <u>we</u> do the selling for you.

73. To encourage investors, defendants provided a number of distributor support tools, including the above-referenced series of conference and training calls. To promote memberships, defendants held several of these conference calls daily, including weekends.

74. Moreover, defendants offered for sale and encouraged investors to purchase, for approximately $280, a list of potential investor names to be used to promote the internet malls and to recruit new members.

75. Defendants also provided members with prepared telephone scripts, and sample web site, print media, fax and direct mail advertisements. These were all designed to enable investors to recruit additional members as part of defendants' pyramid scheme.

76. PrimeBuy's Information Center also featured support tools. By calling the Information Center's extension 1, the listener accessed a "series of powerful testimonials – people from every walk of life sharing their rewarding experiences with PrimeBuy Network.com. A very powerful tool available for your use"

77. By dialing the PrimeBuy Information Center's extension 2, the listener accessed

PrimeBuy's "full conference presentation."

78. The PrimeBuy Information Center's Extension 3 provided listeners with "a 10-minute business opportunity presentation – a shortened version of the full conference presentation . . . ."

79. Finally, extension 4 offered listeners "a detailed explanation of the Pay Plan." That extension also provided access to written scripts and other advertising resources approved by the Company.

80. Defendants feature recorded telephone conferences on PrimeBuy's internet web site, www. Primebuytown.com. During these telephone conferences, directed toward PrimeBuy investors, defendants tout the success and expansion of the Company and new marketing gimmicks with statements including but not limited to the following:

- "We are 22 months into our business model here at Prime Buy. Twenty-two months along in the industry, we're one of the top success stories today in the entire direct selling industry worldwide, something we're very, very proud of here at Prime Buy. Of course, that could not have been accomplished if it were not for you, your participation, your dedication, your help, your efforts in growing this company. And, in growing this company, of course, growing your own financial independence. That's what Prime Buy is all about. We're very proud of the fact that we've helped thousands of families today achieve a new level of lifestyle. And that's something that we intended to do from day one and we're very, very successful. I can't tell you the number of people that have called us and that we've talked to that we've helped along their financial path, people that we've helped save their homes from foreclosure, people who were on the border of filing bankruptcy that were able to avoid it because of this business model and then being able to drive additional dollars into their household, people who couldn't send their children to college who today are sending their children to college because they've been able to drive a tremendous secondary or primary household income in from our business model and the industry. People who are just plain enjoying a whole new lifestyle, getting out of debt, eliminating debt, living a life debt-free through our business model."

- "We're in the process of launching Prime Buy in Mexico, throughout Mexico and other parts of Latin America through a very large major strategic alliance that's taking place. That growth is going to help everybody grow their business. Your

business will grow throughout Mexico and Latin America, too as this major expansion takes place."

- "We're also in some pretty serious negotiations for strategic alliances that would take our business throttle into Europe as well."

- "We're producing PowerPoint presentations currently. These presentations are probably three our four days out from being completed as well, being edited. As they are completed, then we'll be making those available as well."

- "We will have a whole new conference call format, totally new, totally refreshed, and totally concentrated around Prime Track and the Fund Daily concept, and, some of the topics that we talked about here tonight. You'll want to be there; bring your guests. It'll be very electric, no question about it. Some great testimonials scheduled and planned as well."

- "We are in the process also of producing a very powerful audiotape which is also going to help propel your business with a whole new concept of Fund Daily as well. And that audiotape is somewhat controversial. The title of the audiotape is "Dying Broke." The content of the audiotape addresses where we are as a society today, the financial challenges that we're presented with and some solutions and one of the solutions, obviously, being Fund Daily."

81. During conference calls, defendants promote this "new product, a new service called Fund Daily," which purportedly enables PrimeBuy investors to "direct [commission]funds into a selection of mutual accounts." That's fund daily and it's going to help change the entire course of this industry and, of course, it's going to help change we hope, which is our goal, the critical situations that we deal with today as a society in America. . . . Something magical happens though if somebody can get that investment vehicle started for less and with Fund Daily, amounts as small as $5.00 can be directed towards the account." Plaintiffs believe Fund Daily is an unregistered mutual fund.

82. Defendants also feature lengthy recorded telephone messages on Primebuy's internet web site, www.primebuytown.com/newportcapital/, entitled "A message from Gary Bryant,

President, Newport Capital." Defendant Bryant, as President of Newport, touts PrimeBuy as the "finest" and "best" company in America. Bryant makes numerous fraudulent, false, deceptive, and misleading statements and promises regarding the PrimeBuy's debt, PrimeBuy's profitability, PrimeBuy's plans for a public stock offering, PrimeBuy's stock price, and even PrimeBuy's merger opportunities with three or four other companies. Defendant Bryant's materially false and misleading statements include but are not limited to the following:

- "I've taken a lot of companies public, *about as many as just about anybody in the United States*, and maybe more people or less, but I'm sure in the ball park, I do know a little bit about taking companies public. And I was talking to Bob Rader here the other day with Capital West, and Bob questioned me on some of what I was doing right now and what have you, and I told him I thought I had the finest company that I've ever seen in my 30 some odd years in the business and he said, well, that's impressive, *I'll buy without even looking at it*." (emphasis added.)

- "*we're* selling a different product—*we* could sell *any* product we want to in PrimeBuy." (emphasis added.)

- "I've talked to probably 25-50 brokers, I don't even know how many, about PrimeBuy, every one of them when we go public want to be part of PrimeBuy, they want to own stock."

- "I told Bob that this [PrimeBuy] was the best company I had ever seen... I did say it. And I'll stand behind it."

- "I do think PrimeBuy is one of the top companies I've ever seen."

- "PrimeBuy last year did $10 million the first year ... and PrimeBuy will probably easily do $30 million this year..."

- "I understand that we are 100% debt free, which means a lot—we're not in the hole. My grandad was an old banker and he told me you never go broke if you don't owe anybody. And that's exactly where PrimeBuy is."

- "And they really have a growing company and we've got the profits... [W]e're a profitable company and I know right there when we started this it seemed like the

very, I don't know whether it was the first month or the second month, somewhere along in there, we broke into a profit position."

- "since I've been with PrimeBuy, I think they have one of the best business models that I've ever seen."

- "Charlie, you're right you paid out about $7,000,000 against the $10,000,000 income we had last year, right? [Yeah, that's correct]"

- "Conservatively this year, we will do $30 million."

- "Remember it took the other company twelve years to do the $20 million and second year we will do $30 million and we talk of maybe 15-20% the bottom line…"

- "If we do get the goal of the $30 million, which they've never missed the goal on me yet, Chuck and Charlie haven't—three times their sales are 30 times earnings, if you divide that out and multiply it, by the number of shares outstanding, *it shows that we got a $20-30 stock.*" (emphasis added.)

- "We planning on going public this year, it will be late this year that we're planning on going public."

- "We have 2, 3, 4 underwriters that are just [unintelligible] daily to make sure that they want to be part of the underwriting or at least part of this deal."

- "We've also had some merger opportunities, there have been 3 or 4 companies that would love to merge with us, with PrimeBuy being the surviving company…"

- "I think it's one of the finest companies in the industry. It's not the finest, … it's the best company I've ever seen …"

- "you know when I look across the United States and believe you me, I look at companies across the country daily, this is the best one in the United States of America. If I was buying a stock tomorrow—I've told that to my wife, I've told that to my daughter, and [unintelligible] believe it from the bottom of my heart."

83. A PrimeBuy representative identified as "Charlie," who plaintiffs believe to be

defendant Charlie Culver, states that Bryant has been part of PrimeBuy since day one:

"Boy, Gary gave some great trading words of wisdom and we're all very proud that *Gary is a part of this company and has been since day one*—30 years experience in finance, seeing companies throughout that experience and as you just heard him say, *one of the finest* companies, if not the, that he's seen in his entire career is PrimeBuy and of course *we all believe that very much as well.* We're excited and there's a big-big year in store for us this year." (emphasis added.)

84. As described herein, during the Class Period, defendants offered investments in PrimeBuy by representing to potential investors that this company was a growing Internet marketing opportunity that would be going public in September 2000.

85. In reality, however, defendants were conducting a classic "pyramid" scheme. The so-called PrimeBuy Internet Mall was simply a multilevel marketing scheme for which no material consideration was offered other than compensation for soliciting other members. The so-called shopping malls were meaningless, as they merely constituted an array of shopping "opportunities" already available on the Internet.

86. PrimeBuy was a classic "pyramid" scheme, in which participants attempt to make money primarily by recruiting new participants into the program. The hallmark of these schemes is the promise of large returns in a short period of time in exchange for the investor doing nothing other than handing over his or her money.

87. In this case, defendants went to great lengths to make PrimeBuy look like a legitimate multi-level marketing program. Despite their claims that they offered legitimate products and services for sale, defendants simply used the money coming in from new recruits to pay expenses and pay off any earlier investors who demanded payment. Ultimately, however, the promoters are unable to raise enough money from new investors and the pyramid becomes impossible to sustain.

88. Evidence of defendants' efforts to portray PrimeBuy as a legitimate business is found in the State of Oregon, where defendants nearly convinced an Oregon county judge and legal assistant that PrimeBuy provided a viable fundraising opportunity to support drug diversion programs.

89. A National Law Journal article dated November 27, 2000 described an incident in which the Oregon legal assistant attempted to invest court funds in PrimeBuy for fundraising purposes. The article stated that the Oregon Attorney General's office determined that PrimeBuy was an illegal pyramid scheme. Judge Darryl Larson, a Lane County, Oregon, Drug Court judge, was still not entirely convinced, stating that "There are many things on the Internet that we don't know yet if they're legal . . . . Maybe it's cutting edge." The Judge asked the Attorney General to investigate further and issue an opinion.

90. On December 8, 2000, in a letter to Tali McKay of the Lane County Drug Court, Drew A. Lianopolous, Assistant Attorney General for the State of Oregon Department of Justice Civil Enforcement division wrote in part:

> [T]he Primebuynetwork.com program bears several characteristics that are typical of an illegal pyramid scheme. For example, the primary method of generating money from this operation seems to be through recruitment of new mall operators who purchase the tracking software or sales aids. While legitimate sales commissions of actual products sold through a mall site could, in theory, generate legitimate revenue, in practice we have not found that to be the case. We suspect that most if not all profit to be realized will come from selling the software package to new "downline" mall operators.
>
>         \*       \*       \*
>
> Our experience with many [multilevel marketing] schemes reveals that most participants end up losing most of the money they "invest," while a select few people at the top reap thousands of dollars collected at the expense of those below them.

91. On December 27, 2000, the Associated Press announced that the "Attorney General's office had said it considers PrimeBuy to be an illegal pyramid scheme because it pays some commissions based on recruiting additional distributors rather than the sale of products."

92. As part of their scheme, defendants offered and sold various promotional products, including software and videos, at additional cost to plaintiffs and the other members of the Class and Subclass.

93. During the Class Period, defendants also sold illegal, unregistered shares of stock to plaintiffs and the other members of the Class and Subclass.

94. Stock certificates were dated September 28, 1999, although they were not purchased until many months later.

95. Both of the Individual Defendants signed the stock certificates.

96. Aware of registration requirements, defendants also misrepresented that PrimeBuy's stock was or would soon be publicly traded on an open market, with statements such as the following, which appeared on www.primebuynetwork.com:

> The company: *Publicly traded*, driving shareholder value by building community and massive traffic.

(emphasis supplied).

97. During the Class Period, defendants claimed to operate several "stock incentive programs" and misrepresented that they were "gifting" shares of stock and/or options to investors when, in reality, defendants required investors to purchase stock at $1.00 per share.

98. For example, defendants placed the following "Stock Offering to Independent Distributors" on www.primebuynetwork.com:

Effective February 18th, a new stock incentive program is in effect. Independent Distributors have the option to receive gifted stock for an indefinite period of time. A Manager who has been with the company for 30 days and certifies that he/she has reviewed all the policies, procedures, and training materials received in the Welcome Kit is eligible for 50 shares of stock. This stock is vested for one (1) year, at which time it becomes available to an "Active Distributor." An Active Distributor is one who has done a minimum of $50 per month of Personal Business Volume (PBV) for any six (6) months of a 12-month period.

A Regional Manager who has been with the company for 30 days and certified that he/she has completed the home study course and read all the policies and procedures is eligible for 200 shares of gifted stock. The stock is vested for one (1) year, at which time it becomes available to an "Active Distributor." An Active Distributor is one who has done a minimum of $50 per month of Personal Business Volume (PBV) for any six (6) months of a 12-month period.

In addition, any Regional Manager who completes two (2) Regional Manager customer groups within a 90 day period of joining qualifies for an additional 200 shares in options that he/she may purchase for $1 a share for up to a year.

99. Similarly, in response to the question, "How long will the current Stock Gifting offering be in place," defendants responded:

It's hard to determine. A block of stock has been set aside so the first few thousand members may be shareholders in the company. With our current rate of growth the gifting program will end sometime in the first quarter of 2000.

100. In reality, however, this stock was not "gifted." Plaintiffs and the other members of the Class and Subclass purchased shares of common stock, also known as "founders stock," for $1 per share, pursuant to defendants' solicitation, and were issued PrimeBuy stock certificates. The so-called "gifted" stock was provided to investors in exchange for their payment of a PrimeBuy membership fee. The higher the membership fee paid, the more "gifted" shares they received.

101.   Defendants were fully aware of the registration requirements mandated by state and federal securities laws and aware that PrimeBuy did not comply with any exemptions to registration.   Nevertheless, throughout the Class Period, defendants sold stock in flagrant violation of these laws to plaintiffs and the other members of the Class and Subclass.

102.   At times, defendants disclosed the fact that the stock certificates were unregistered, but they intentionally misrepresented to plaintiffs and the other members of the Class and Subclass that the stock was legally issued pursuant to an exemption from registration and/or omitted to disclose that the stock was not issued pursuant to an exemption from registration.   This allowed the defendants to conceal and perpetrate their fraudulent scheme throughout the Class Period.

103.   At other times, they misrepresented that the shares were indeed registered in compliance with applicable state and federal laws.

104.   Moreover, investors were repeatedly advised that PrimeBuy would be selling stock in an initial public offering ("IPO") in the near future. Defendants initially and repeatedly identified an IPO date of September 2000, yet as of the time of the filing of this complaint, no such offering has occurred.   In the marketing materials provided by defendants to plaintiffs and the other members of the Class and Subclass, defendants advised that PrimeBuy would be "Going public (Wall Street), Fall 2000."   Defendants' web site, www.primebuynetwork.com continues to tout its success and currently advises investors that the IPO will occur "sometime in 2001":

> The company continues to dedicate tremendous resources to building a community of 100,000 Independent Business Owners, and is on track to achieving this benchmark within the first 18 months of operation.

PrimeBuy™ Network.com projects an increase to 250,000 Independent Business Owners (shoppers) within 36 months. With a recognized value of $200 per member shopper, PrimeBuy™ Network.com's estimated valuation will be in excess of $50 million for its shareholders. The company anticipates an initial public offering sometime in 2001.

105. In "Executive Summary" materials provided by defendants to plaintiffs and the other members of the Class and Subclass, defendants represented that "1,000,000 shares of PrimeBuyNetwork.com stock will be allocated for the IPO (initial public offering) which will start at $5-$6 per share," yet they nevertheless continued to offer and sell the unregistered PrimeBuy securities.

106. Similarly, Bryant assured investors and potential investors that PrimeBuy stock was worth $20 to $30 per share.

107. In the offer and sale of PrimeBuy memberships and/or stock to investors, the defendants failed to disclose material facts and misrepresented material facts including, but not limited to:

    a) That the PrimeBuy memberships and stock certificates sold by defendants were "securities" within the meaning of section 2(1) of the Act, section 3(a)(10) of the Exchange Act, and Idaho Code section 30-1402(12);

    b) That the sale of PrimeBuy memberships and stock constituted the sale of securities that were not registered with appropriate regulatory agencies and were not otherwise exempt from securities registration laws and regulations;

    c) That the PrimeBuy memberships and stock were required to be registered under state and federal securities laws;

    d) The financial condition of the issuing entity (including financial statements);

e) That PrimeBuy was in fact an illegal pyramid scheme, and its program was not based upon retail sales to the ultimate consumer; and

f) Other material prospectus information that would have been available to investors had the securities been registered.

108. In addition, PrimeBuy misrepresented that "Independent Sales Representatives may return literature in reusable and in re-salable condition at anytime within 30 days of purchase and receive [a] 100 percent refund." Defendants further misrepresented that refunds would be provided "within 30 days of actual receipt of item(s) returned."

109. Even when PrimeBuy literature was returned to defendants within 30 days of purchase and in reusable and re-salable condition, PrimeBuy refused to issue the promised refund.

110. For example, on or about February 22, 2001, plaintiff Matthew Douglas requested a refund of his investment from defendants.

111. On or about March 8, 2001, defendants advised Matthew Douglas that they would process a refund of his investment, provided he returned his PrimeBuy materials and copies of his cancelled checks used to purchase his PrimeBuy securities.

112. On or about March 26, 2001, Matthew Douglas returned his materials, including cancelled checks payable to PrimeBuy, to the Company, but no refund followed.

113. Then, in response to Matthew Douglas' repeated refund requests, defendants, through their employee, on April 17, 2001, refused to refund Matthew Douglas' stock investment, stating:

As far as your refund, I just received a memo from the accounting department stating that none of the stock purchases can be refunded because of what you agreed to when you purchased those.

114. Defendants have no intention of refunding Matthew Douglas' membership or stock investments and continue to misrepresent that PrimeBuy will have an initial public offering in 2001, despite their noncompliance with state and federal registration requirements.

115. As recently as April 25, 2001, an e-mail from Mr. Michel was sent to Matthew Douglas stating the following:

Matthew,
Our growth continues at a record pace at PrimeBuy. Our mall is now the worlds largest on line shopping community that is member driven. We have over 40 million products and 1,200 vendor/partners. Brand names such as IBM, Apple, Dell, Compaq, Sony, Disney, Mattel, Wal-Mart, Nordstrom's, Lands End, Eddie Bauer, Etc, etc.(Take at look!!) We are looking forward to our public offering on Wall St when the timing is right, _Probably Spring or Fall. We also have tremendous growth internationally with reps in 25 foreign countries!! We are confident our IPO will do well because we have brand name $10 mill in sales 1st yr and we are profitable!
Thanks
Chuck

116. In response to another refund request by Matthew Douglas, defendants, through their employee, on April 18, 2001, replied: "tell him investing in a pre-IPO company is a risk he took."

117. Yet nowhere was this "risk" disclosed in any written offering materials, as required by state and federal securities laws.

118. As of the date of this Complaint, defendants have failed to refund Matthew Douglas' refund, as initially promised.

119.    The truth began to emerge when, contrary to defendants' aggressive representations that the IPO would occur during September 2000, as of September 30, 2000, no initial public offering of PrimeBuy stock had occurred.

120.    Moreover, it became evident on or about April 25, 2001, that defendants' representations that memberships and stock investments were completely refundable were also materially false and misleading.

121.    Plaintiffs and members of the Class and Subclass did not know, and by the exercise of reasonable diligence could not have known, of their claims prior to this date.

122.    Plaintiffs reasonably relied to their detriment on defendants' purported refund policy.

123.    Defendants are equitably estopped from arguing a statute of limitations defense during the time of pending "refunds." Alternatively, the running of any statute of limitations is tolled during the time of the pending "refunds."

124.    Defendants made or caused to be made misrepresentations and omissions set forth above, disregarding the fact that said misrepresentations were untrue and that they were omitting to state material facts that would have made those facts not misleading. Further, in making these misrepresentations and omissions, defendants knew or recklessly disregarded the fact that plaintiffs and the members of the Class and Subclass would rely on the statements to their detriment. Defendants breached their duties of disclosure to plaintiffs and members of the Class and Subclass by failing to disclose material facts as well as other facts relating to the true state of events as described herein.

125.    At the time of these misrepresentations, omissions, and non-disclosures, plaintiffs and the members of the Class and Subclass were not aware of the non-disclosures or that the statements made by the defendants were either untrue or contained misleading omissions. Plaintiffs and Class and Subclass members reasonably relied on the truth and completeness of the material representations made to them.

126.    Moreover, after the filing of the initial Complaint in this matter, defendant Culver issued a statement, via e-mail to PrimeBuy investors, in which he assured the investors that PrimeBuy was a legitimate operation and PrimeBuy securities were issued legally. Culver's statement includes, but is not limited to the following:

> Fortunately for all of us PrimeBuy Network.com, Inc., has been one of the select few successful business models in the new economy, thanks to many of your individual efforts. PrimeBuy has also helped many individuals create a whole new lifestyle for their families and themselves. Many individuals have avoided bankruptcy and foreclosure thanks to the business opportunity and additional household income they've earned through the PrimeBuy business model. All of us indeed enjoy the tremendous amalgamation found in our world-class online community providing selection, convenience, security and savings associated with millions of name-brand products and services. . . .

> Be assured, that . . . PrimeBuy in fact does operate a legal Multi-level plan. All designs have been approved and supported by an opinion letter from Gerald Nehra. Mr. Nehra is one of a very few attorneys nationwide whose practice is devoted exclusively to direct selling and multi-level marketing issues. . . . PrimeBuy has never had a challenge from any state or federal authority over the legitimacy of its plan. If PrimeBuy where to be challenged at any time during the future we will easily be able to demonstrate the legitimacy of the MLM plan and; . . . all stock issued by PrimeBuy through pre-association required a signed acknowledgment of all representations prior to receiving stock in PrimeBuy. The representations included the disclosure by PrimeBuy, and the signed acknowledgement of the receiver of stock, that the stock was in fact "unregistered" and "restricted". Additionally, while PrimeBuy does in fact

intend to initiate an Initial Public Offering (IPO), it was also disclosed, and acknowledged by way of signature, "there could be no assurance of this occurring". Hundred's of companies during the same time frame have postponed planned IPO's for a time when investor confidence in Internet companies and the new economy returns. We too are looking forward to that day.

. . . In no way does the Douglass [sic] Complaint effect PrimeBuy, or the business opportunity for PrimeBuy Independent Sales Representatives. Companies one year old, and companies 100 years old face these types of challenges, particularly if they are successful with their endeavor.

PrimeBuy will continue to support its Independent Sales Representatives and their customers and continue to grow our prestigious online community in the new economy with your support.

Sincerely,
Charlie Culver
PrimeBuy Network.Com
http://primebuytown.com/cash
mailto:cculver@primebuytown.com

127.    The foregoing conduct also constitutes the employment by the defendants of a device and scheme to defraud, as well as acts, practices, and a course of dealing which operate as a fraud.

128.    During the Class Period, the defendants engaged in a plan, scheme, unlawful conspiracy, and course of conduct, pursuant to which they knowingly and recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud upon plaintiffs and other members of the Class and Subclass. They made various untrue statements of material facts and omitted to state material facts necessary to make the statements made not misleading to plaintiffs and other Class and Subclass members. The purpose and effect of said conspiracy, plan, and scheme was to induce plaintiffs and Class and Subclass members to invest in PrimeBuy memberships and/or stock.

## NO SAFE HARBOR

129.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of PrimeBuy who knew that those statements were false when made.

## COUNT I
### Violations of Sections 5(a), 5(c), and 12(a)(1) of the Act

130.     Plaintiffs restate and incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint, except to the extent that such paragraphs charge defendants with intentional or reckless misconduct.

131.     This Count is brought pursuant to Sections 5(a), 5(c) and 12(a)(1) of the Act against all defendants on behalf of all persons who purchased or otherwise acquired unregistered securities in the form of memberships and/or stock issued by PrimeBuy during the Class Period.

132.     During the Class Period, defendants, directly or indirectly, singly or in concert

with others, offered to sell, sold, and delivered after the sale, PrimeBuy unregistered securities and, directly and indirectly, (a) made use of the means and instruments of transportation and communication in interstate commerce and of the mails to sell such securities, through the use of written contracts, offering documents and otherwise, (b) carried and caused to be carried through the mails and in interstate commerce by the means and instruments of transportation such securities for the purpose of sale and for delivery after sale, and (c) made use of the means or instruments of transportation and communication in interstate commerce and of the mails to offer to sell such securities.

133.    Defendants were sellers, offerors, and/or solicitors of the sales of the unregistered PrimeBuy securities that are the subject of this Complaint.

134.    No registration statement has been filed with the Securities and Exchange Commission or was otherwise in effect during the Class Period with respect to the offer and sale of any securities described herein.

135.    In connection with such transactions, defendants failed to deliver a prospectus consistent with the requirements of Section 5 of the Act, 15 U.S.C. § 77e.

136.    At the time this action was filed, less than three years had elapsed from the time that the securities upon which this Count is brought were sold to the public to the time of the filing of this action. Less than one year had elapsed from the time when plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based until the time of the filing of this action.

137.    By reason of the foregoing, the defendants violated Section 5(a) and (c) of the Act, 15 U.S.C. §77e(a) and (c), and Section 12(a)(1) of the Act, 15 U.S.C. § 77l(a)(1).

138.    Accordingly, plaintiffs and the other members of the Class have the right to rescind and recover the consideration paid for their PrimeBuy memberships and shares of PrimeBuy common stock, less any income derived thereon and, accordingly, may elect to rescind, tender their PrimeBuy memberships and shares PrimeBuy common stock to defendants, and seek recovery of damages in an amount to be proved at trial.

139.    This Count is not grounded in fraud.

### COUNT II
### Violations of Section 12(a)(2) of the Act

140.    Plaintiffs restate and incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint, except to the extent that such paragraphs charge defendants with intentional or reckless misconduct.

141.    This Count is brought pursuant to Section 12(a)(2) of the Act against all defendants on behalf of all persons who purchased or otherwise acquired unregistered securities in the form of memberships and/or stock issued by PrimeBuy during the Class Period.

142.    During the Class Period, defendants offered and sold unregistered securities by use of the means or instruments of transportation and communication in interstate commerce and of the mails, by means of offering materials and oral communications, which included materially false and misleading statements of fact and omitted to state material facts necessary in order to make the statements of fact, in the light of the circumstances under which they were made, not misleading.

143.    Defendants were sellers, offerors, and/or solicitors of the sales of the unregistered PrimeBuy securities that are the subject of this Complaint.

144. By reason of the conduct alleged herein, the defendants violated, and/or controlled a person who violated, Section 12(a)(2) of the Act.

145. Accordingly, plaintiffs and the other members of the Class have the right to rescind and recover the consideration paid for their PrimeBuy memberships and shares of PrimeBuy common stock, less any income derived thereon and, accordingly, may elect to rescind, tender their PrimeBuy memberships and shares PrimeBuy common stock to defendants, and seek recovery of damages in an amount to be proved at trial.

146. None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the offering materials or sales presentations were true and without omissions of any material facts. Each of the defendants (except for the Company, which is strictly liable) acted negligently.

147. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of the untruths and/or omissions made by defendants in connection with the offer and sale of the unregistered securities that are the subject of this Complaint.

148. At the time this action was filed, less than three years had elapsed from the time that the securities upon which this Count is brought were sold to the public to the time of the filing of this action. Less than one year had elapsed from the time when plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based until the time of the filing of this action.

149. By reason of the foregoing, the defendants violated Section 12(a)(2) of the Act, 15 U.S.C. §77l(a)(2), and plaintiffs and Class members have suffered substantial damages as a result.

150.    This Count is not grounded in fraud.

## COUNT III
### Violations of Section 15 of the Act

151.    Plaintiffs restate and incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint, except to the extent that such paragraphs charge defendants with intentional or reckless misconduct.

152.    This Count is brought pursuant to Section 15 of the Act against the Individual Defendants on behalf of all persons who purchased or otherwise acquired unregistered securities in the form of memberships and/or stock issued by PrimeBuy during the Class Period.

153.    Each of the Individual Defendants was a control person of PrimeBuy by virtue of his position(s) as a director and/or as officer of PrimeBuy. In addition, the Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors, officers and/or major shareholders of PrimeBuy.

154.    At the time this action was filed, less than three years had elapsed from the time that the securities upon which this Count is brought were sold to the public to the time of the filing of this action. Less than one year had elapsed from the time when plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based until the time of the filing of this action.

155.    Each of the Individual Defendants was a culpable participant in the violations of Sections 5(a), 5(c), 12(a)(1) and 12(a)(2) of the Act alleged in Counts I and II above, based on their participation in the process which allowed the completion of the sale of unregistered securities to be completed.

156.    Plaintiffs and Class members have suffered substantial damages as a result of the violations alleged herein.

157.    This Count is not grounded in fraud.

**COUNT IV**
**Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder**

158.    Plaintiffs restate and incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

159.    This Count is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, against all defendants on behalf of all persons who purchased or otherwise acquired unregistered securities in the form of memberships and/or stock issued by PrimeBuy during the Class Period.

160.    The defendants, directly or indirectly, singly or in concert with others, in connection with the purchase and sale of securities, by use of the means and instrumentalities of interstate commerce and by use of the mails (a) have employed devices, schemes and artifices to defraud; (b) have made untrue statements of material facts and have omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) have engaged in acts, practices and courses of business which operated as a fraud and deceit upon purchasers, prospective purchasers and other persons.

161.    As a part of and in furtherance of their scheme to defraud, the defendants, directly and indirectly, prepared, disseminated or used contracts, written offering documents, promotional materials, investor and other correspondence and oral presentations which contained untrue statements of material facts and misrepresentations of material facts and which omitted to

state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including, but not limited to, those set forth above.

162.    Defendants were sellers, offerors, and/or solicitors of the sales of the unregistered securities that are the subject of this Complaint.

163.    No registration statement has been filed with the Securities and Exchange Commission or was otherwise in effect during the Class Period with respect to the offer and sale of any securities described herein.

164.    The defendants made those misrepresentations and omissions knowingly or with reckless disregard for the truth.

165.    Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of the untruths and/or omissions made by defendants in connection with the offer and sale of the unregistered securities that are the subject of this Complaint.

166.    At the time this action was filed, less than three years had elapsed from the time that the securities upon which this Count is brought were sold to the public to the time of the filing of this action. Less than one year had elapsed from the time when plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based until the time of the filing of this action.

167.    By reason of the foregoing, the defendants violated the provisions of Section 10(b) of the Exchange Act, 15 U.S.C. § 78(b), and Rule 10b-5, 17 C.F.R. § 240.15b-5, and plaintiffs and Class members have suffered substantial damages as a result.

## COUNT V
### Violations of Section 20(a) of the Exchange Act

168.    Plaintiffs restate and incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

169.    This Count is brought pursuant to Section 20(a) of the Exchange Act against the Individual Defendants on behalf of all persons who purchased or otherwise acquired unregistered securities in the form of memberships and/or stock issued by PrimeBuy during the Class Period.

170.    The Individual Defendants, by virtue of their offices and positions and the specific acts described above were, at the time of the wrongs alleged herein, controlling persons of PrimeBuy within the meaning of Section 20(a) of the Exchange Act.

171.    The Individual Defendants had the power and influence and exercised the same to cause PrimeBuy to engage in the illegal conduct and practices complained of herein.

172.    By reason of the conduct alleged in the preceding Count of this Complaint, the Individual Defendants violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78(t)(a), and are liable for the aforesaid wrongful conduct and are liable to plaintiffs and the other members of the Class for the substantial damages they suffered in connection with their purchases of PrimeBuy securities during the Class Period.

## COUNT VI
### Violations of Idaho Securities Act, Idaho Code §§ 30-1416 and 30-1446(1)

173.    Plaintiffs restate and incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

174.    This Count is brought pursuant to the Idaho Securities Act, Idaho Code Sections 30-1416 and 30-1446(1), against all defendants on behalf of the Subclass of all persons who

purchased or otherwise unregistered securities in the form of memberships and/or stock issued by PrimeBuy in the State of Idaho during the Class Period.

175.    During the Class Period, defendants offered to sell and sold unregistered PrimeBuy securities within the State of Idaho by means of untrue statements of material facts or omissions to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.

176.    During the Class Period, the defendants, directly or indirectly, singly or in concert with others, in connection with the offer for sale, purchase and sale of securities (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which operate as a fraud and deceit upon purchasers, prospective purchasers and other persons.

177.    As a part of and in furtherance of their scheme to defraud, the defendants, directly and indirectly, prepared, disseminated or used contracts, written offering documents, promotional materials, investor and other correspondence and oral presentations which contained untrue statements of material facts and misrepresentations of material facts and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including, but not limited to, those set forth above.

178.    Defendants were sellers, offerors, and/or solicitors of the sales of the unregistered securities that are the subject of this Complaint.

179.    No registration statement has been filed with the Securities and Exchange

Commission or was otherwise in effect during the Class Period with respect to the offer and sale of any securities described herein, nor were the securities described herein subject to any exemption from registration under the state or federal securities laws.

180.    The defendants made those misrepresentations and omissions knowingly or with reckless disregard for the truth.

181.    Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of the untruths and/or omissions made by defendants in connection with the offer and sale of the unregistered securities that are the subject of this Complaint.

182.    At the time this action was filed, less than three years had elapsed from the time that the securities upon which this Count is brought were sold to the public to the time of the filing of this action.

183.    By reason of the foregoing, the defendants violated the provisions of Idaho Code Sections 30-1416 and 30-1446(1), and plaintiffs and Subclass members have suffered substantial damages as a result.

**COUNT VII**
**Violations of Idaho Securities Act, Idaho Code §§ 30-1416 and 30-1446(2)**

184.    Plaintiffs restate and incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

185.    This Count is brought pursuant to the Idaho Securities Act, Idaho Code Sections 30-1416 and 30-1446(2), against the Individual Defendants on behalf of the Subclass of all persons who purchased or otherwise acquired unregistered securities in the form of memberships and/or stock issued by PrimeBuy in the State of Idaho during the Class Period.

186. The Individual Defendants, by virtue of their offices and positions and the specific acts described above were, at the time of the wrongs alleged herein, persons in control of PrimeBuy within the meaning of Idaho Code Section 30-1446(2).

187. The Individual Defendants had the power and influence and exercised the same to cause PrimeBuy to engage in the illegal conduct and practices complained of herein.

188. By reason of the conduct alleged in the preceding Count of this Complaint, the Individual Defendants violated Section 30-1446(2) of the Idaho Code, and are liable for the aforesaid wrongful conduct and are liable to plaintiffs and the other members of the Subclass for the substantial damages they suffered in connection with their purchases of PrimeBuy securities during the Class Period.

189. The Individual Defendants were sellers, offerors, and/or solicitors of the sales of the unregistered securities that are the subject of this Complaint.

190. The Individual Defendants participated and/or materially aided in the sale of the unregistered PrimeBuy securities that are the subject of this action, and knew, or in the exercise of reasonable care could have known, of the existence of the facts by reason of which this liability is alleged to exist.

191. By reason of the foregoing, the defendants violated the provisions of Idaho Code Sections 30-1416 and 30-1446(2), and plaintiffs and the other members of the Subclass have suffered substantial damages as a result.

192. By reason of the foregoing, the defendants are jointly and severally liable for the substantial damages sustained by plaintiffs and the other members of the Subclass.

F.     Granting extraordinary equitable and/or injunctive relief as permitted by law, equity and federal and state statutory provisions sued on hereunder, including attaching, impounding, imposing a constructive trust upon or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiffs have an effective remedy; and

G.     Granting such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.


Dated this 6th day of July, 2001.

COSHO, HUMPHREY, GREENER & WELSH, P.A.
KELLER ROHRBACK LLP


By_____
    Richard H. Greener
    Attorneys for Plaintiff Class

# PRIMEBUY NETWORK.COM, INC.

## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAW

Matthew J. Douglas ("Plaintiff"), duly swears and says, as to the claims asserted under the federal securities laws, that:

1. I have reviewed the complaint against **PRIMEBUY NETWORK.COM, INC.** and its co-founders, I approve of its contents, and I authorize the complaint to be filed on my behalf.

2. I did not purchase the security that is the subject of this action at the direction of my counsel or in order to participate in this private action.

3. I am willing to serve as a representative plaintiff on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. My transactions in the securities of **PRIMEBUY NETWORK.COM, INC.**:

| Shares Purchased | Date of Purchase | Price Per Share |
|---|---|---|
| 1000 | 3/22/00 | $1.⁰⁰ /share |
| + 200 "gifted" membership | 3/20/00 | $ 790 ⁰⁰ total |

5. I have not sought to serve as a class representative in any other action filed under the United States federal securities laws in the past three (3) years preceding the date on which this certification is signed, except as listed below.

6. I have not and will not accept any payment for serving as a representative plaintiff on behalf of the class beyond my pro rata share of any recovery, or as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 30 day of april , 2001, at Hayden Lake, ID .

*(City, State)*

By: _Matt Douglas_
*(Signature)*

PRINT NAME: Matthew J. Douglas

KELLER ROHRBACK L L P
SUITE 3200
1201 THIRD AVENUE
SEATTLE, WASHINGTON 98101-3052
(206) 623-1900
FAX (206) 623-3384

# PRIMEBUY NETWORK.COM, INC.

## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAW

Glen Douglas ("Plaintiff"), duly swears and says, as to the claims asserted under the federal securities laws, that:

1. I have reviewed the complaint against PRIMEBUY NETWORK.COM, INC. and its co-founders, I approve of its contents, and I authorize the complaint to be filed on my behalf.

2. I did not purchase the security that is the subject of this action at the direction of my counsel or in order to participate in this private action.

3. I am willing to serve as a representative plaintiff on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. My transactions in the securities of PRIMEBUY NETWORK.COM, INC.:

| Shares Purchased | Date of Purchase | Price Per Share |
|---|---|---|
| *200 "gifted" for membership | 2/23 | $790 ⁰⁰ (membership) |
| * 3500 | 3/13 | $1.00 |
| * 500 | 3/22 | $1.00 |

5. I have not sought to serve as a class representative in any other action filed under the United States federal securities laws in the past three (3) years preceding the date on which this certification is signed, except as listed below.

6. I have not and will not accept any payment for serving as a representative plaintiff on behalf of the class beyond my pro rata share of any recovery, or as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this __5__ day of __May__, 2001, at __Post Falls__, __Id.__

*(City, State)*

By: __Glen Douglas__

*(Signature)*

PRINT NAME: Glen Douglas

KELLER ROHRBACK L.L.P.
SUITE 3200
1201 THIRD AVENUE
SEATTLE, WASHINGTON 98101-3052
(206) 623-1900
FAX (206) 623-3384



I _Roxanne Sarmento_ ("Plaintiff"), duly swears and says, as to the claims asserted under the federal securities laws, that:

1. I have reviewed the complaint against **PRIMEBUY NETWORK.COM, INC.** and its co-founders, I approve of its contents, and I authorize the complaint to be filed on my behalf.

2. I did not purchase the security that is the subject of this action at the direction of my counsel or in order to participate in this private action.

3. I am willing to serve as a representative plaintiff on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. My investments in the securities of **PRIMEBUY NETWORK.COM, INC.** include:

| Membership(s) | Date of Purchase | Amt Paid Per Date |
|---|---|---|
| Regional Manager | 9/21/2000 | $ 800⁰⁰ |

| Stock Purchased | Date of Purchase | Price Per Share (please also indicate if shares were acquired in connection with membership purchase) |
|---|---|---|
| | | |

5. I have not sought to serve as a class representative in any other action filed under the United States federal securities laws in the past three (3) years preceding the date on which this certification is signed, except as listed below.

6. I have not and will not accept any payment for serving as a representative plaintiff on behalf of the class beyond my pro rata share of any recovery, or as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _18_ day of _June_, 2001, at _Grand Junction_, _Colorado_.

_(City, State)_

By _Roxanne Sarmento_
_(Signature)_

PRINT NAME: _Roxanne Sarmento_

KELLER ROHRBACK L.L.P.
SUITE 3200
1201 THIRD AVENUE
SEATTLE, WASHINGTON 98101-3052
(206) 623-1900
FAX (206) 623-3384